[Crim. No. 679. Fourth Dist. Apr. 21, 1950.]

THE PEOPLE, Respondent, v. RALPH DOUGLAS COSSEY et al., Appellants.

Morris Lavine for Appellants.

Fred N. Howser, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

Samuel C. Colby, Amici Curiae on behalf of Respondents.

MUSSELL, J.—Defendants Ralph Douglas Cossey and Gerald F. Burke, after a lengthy trial by jury, were convicted of 10 conspiracies to commit the crime of theft in violation of section 182, subdivision 1, of the Penal Code. These offenses were contained in the first 10 counts of an indictment and were all alleged to have been committed during the period commencing January 2, 1946, and ending on or about August 25, 1948. Defendant John H. Harris was convicted of the conspiracy charged in count three and acquitted as to the remaining charges. All three defendants applied for proba-

tion, which was denied as to defendant Cossey and granted as to defendants Burke and Harris, with a condition, in the case of Burke, that he serve a period of one year in the Riverside Industrial Road Camp, and in the case of Harris, that he serve a period of five months in the same road camp. In addition, a fine of $500 was imposed upon defendant Burke and $250 upon defendant Harris. The defendant Cossey was sentenced to the state prison on each of the 10 counts and judgments against him were ordered to run concurrently on counts one, two, three and four and on count five to run consecutively to the judgment pronounced on the first four counts. The judgment pronounced on counts six, seven, eight and nine were ordered to run concurrently with that pronounced on count five, and the judgment pronounced on count ten was ordered to run consecutively to the judgment pronounced on counts one to nine, inclusive.

Defendant Cossey appeals from the judgment and the order denying his motion for new trial, and defendants Burke and Harris appeal from the orders denying their motions for new trial.

The principal contention of the defendants on this appeal is, in effect, that the verdicts were contrary to the law and evidence and that the evidence was insufficient to justify a conviction of 10 separate and distinct conspiracies.

Each count in the indictment contained a general charge of conspiracy to commit theft and contained an allegation of one or more overt acts, all alleged to have occurred within the period set forth in each of the general charges. In support of count one, two overt acts were alleged. The first count charged the defendants with a conspiracy to commit the crime of theft in violation of section 182 of the Penal Code in that during the period in question they conspired to violate section 484 of the Penal Code, and did unlawfully take the property of designated persons. Count one involved property taken from Jones and Fisher, a copartnership, in the amount of $9.76 on October 21, 1947, and $58.01 on October 27, 1947.

Counts two to ten, inclusive, involved the unlawful taking of property of various persons and firms in varying amounts, all under $200, except that in count five, the sum alleged to have been taken was $295.

Three other offenses were charged in counts eleven, twelve and thirteen of the indictment but the charges contained in these counts are not material to the decision herein as there were no convictions obtained under them.

The essential facts applicable to all counts of the indictment and showing a conspiracy to commit the crime of theft, as set forth in the various counts of the indictment, are as follows: the defendant Ralph Douglas Cossey was the owner and operator of a collection agency in the city of Riverside. On March 10, 1941, he obtained a certificate to do business in the county of Riverside under the fictitious name of the Southern California Collection Company. He also owned an organization known as the National Credit Company. On July 15, 1947, the Medical Dental Associates, Inc., was incorporated to do business as a collection agency in Riverside County. Defendant Cossey was the president of the corporation and defendant Gerald F. Burke was the secretary-treasurer and the managing director. This corporation was inoperative but it did file lawsuits and had a bank account of $2,500. The National Credit Company was formed by Cossey to render credit service.

Defendants Cossey and Burke formed a copartnership in January of 1947 to operate a collection agency in the city of Los Angeles. Defendant Burke was the partner actively engaged in the business and obtained the license for the agency. In October, 1947, defendant Cossey incorporated the partnership, which was known as the Southern California Collection Co., Inc. (of Los Angeles), which was a separate and distinct entity from the Riverside organization.

On September 13, 1947, defendants Cossey and Burke executed a bill of sale to Medical Dental Associates, Inc., of all merchandise, credits, legal actions pending settlement, desks, equipment, office supplies and good will of the corporation.

The Southern California Collection Company, hereinafter designated as the "Agency," had a trust account with the Citizens National Trust and Savings Bank of Riverside. The defendant Cossey and his wife were the only ones authorized to draw on that account. The Medical Dental Associates, Inc., had an account with the same bank and the defendant Burke was the only person authorized to draw on that account. The National Credit Company also had an account in the same bank and defendant Burke was the only one authorized to draw checks on it.

Defendant Burke from time to time signed the salary checks for employees of the agency and for rent of the agency's office, which checks were drawn on the National Credit Company. Defendant Burke assisted in the preparation of checks to clients of the agency, drawn on the trust account of the agency and signed by defendant Cossey.

Defendant Burke went to work for the agency in Riverside in January of 1946 and was there employed at the time of the indictment.

There was testimony that defendant Cossey only made periodical visits to the office of the agency, sometimes once a week or once in 10 days, and in his absence, defendant Burke was looked upon as the manager of the agency. In this connection, Burke made numerous postings in the agency's ledgers and wrote letters with reference to various accounts.

There was testimony by employees of the agency that virtually every day clients would come into the office and state that they had learned that their debtors had paid the agency and complained that they had not received their shares of collections which were long overdue. When this occurred, all employees had been instructed by defendants Cossey and Burke not to handle the matter themselves, but to refer these clients to defendants Cossey and Burke. The excuses used by the defendants were that "the bookkeeper was on vacation"; "that there must be a mistake"; "that the check will be sent out the tenth of the month"; that "we overlooked the matter."

Defendant Burke posted the entries in the breakdown pads of various accounts for over a year and from the daily receipts of the agency, he broke the figures down to determine how much went to the clients and how much to the agency.

On December 31, 1947, the agency filed with the Secretary of State the annual financial statement, as required by law, and which requires that the actual amount of money on deposit in a trust account for the benefit of creditors and the total amount owed to clients must be shown and that those to whom the licensee owes over $5.00 must be listed. The statement showed a balance with the Citizens National Trust and Savings Bank of Riverside of $1,874.98. No outstanding checks were listed and the amount owed to clients totaled $900.12. Defendant Cossey admitted that there were various checks outstanding and not listed on this statement, and that there was money due to clients as of December 31, 1947, which was not listed on the statement. The bank stub book of the trust account of the agency with the Citizens National Trust and Savings Bank of Riverside showed that 134 checks were issued on December 30, 1947, which totaled $4,469.04 and made the agency's adjusted balance show an overdraft of $2,594.06 as of December 31, 1947.

In this connection it should be noted that under the provi-

sions of section 625, chapter 7, title 16, California Administrative Code of the Rules and Regulations Relating to the Licensing and Regulation of Collection Agencies, the client's share of money collected from debtors, with certain exceptions, must be remitted to him within 60 days.

Defendant Cossey testified that the $295 (involved in count five) which had been collected on behalf of the estate of Lee Clair Martin on February 4, 1947, remained in the agency's trust account until March 22, 1948, and that on February 18, 1948, when the balance of the trust account at the Citizens National Bank was the sum of $104.87, "it was possible" he owed the following clients, in addition to the $124 owed to the estate of Lee Clair Martin: Mr. Bartz, $40.83; Dr. Swain, $68.00; Smith's Grocery, $14.37; Weidel Dairy, $65.05; said amounts totaling $312.25.

The evidence as to the overt acts described in the various counts of the indictment may be briefly summarized as follows:

Count 1: Jones and Fisher, oil distributors, turned over the account of debtor L. C. Paris to the agency in the amount of $73.75. On October 23, 1947, debtor Paris sent a check for $58.61 to Jones and Fisher, which was forwarded by mail to the agency. Paris had a credit of $18.14 coming for some returned oil, which made the Jones and Fisher bill $58.61. On May 14, 1948, seven months after the collection, the agency sent Jones and Fisher $15.72 on the Paris account, when they were admittedly entitled to $24.55.

On October 21, 1947, Thomas Miller paid the agency $9.76. This account had been turned over with the Paris account by Jones and Fisher. On July 19, 1948, in response to a request for an accounting from Jones and Fisher, a letter was written by the agency stating that the Miller account had been paid and a check would be forthcoming on the next regular remittance. This letter was the first information received by Jones and Fisher that Miller had paid the agency on October 21, 1947.

Count 2: Woody Smith, a grocer in San Bernardino, assigned to the agency for collection the accounts of debtors Floyd Lee and R. Simmons. Simmons paid the agency $29.75 on February 19, 1948, and obtained a receipt showing the payment. Simmons was in Oklahoma and sent the receipt to his mother, who gave it to grocer Smith. Smith testified that he telephoned the agency three times long distance about getting his share of the Simmons collection and finally received it after he told the agency he was going to see the district

attorney unless the money was sent. The check of the agency, dated July 1, 1948, for $14.37, was not received by Smith until July 28, 1948.

Count 3: Frank Tillie, an undertaker in San Bernardino, assigned to the agency some accounts for collection during 1947, among which was that of a debtor named Navarro. Tillie learned on November 1, 1947, that Navarro had paid the agency in August of that year and immediately went to the office of the agency in Riverside. He spoke to defendant Burke and informed Burke he knew Navarro had paid the money; whereupon Burke asked "How do you know I collected it?" Burke told Tillie the manager was not in; whereupon Tillie left and returned the next day, when he again spoke to defendant Burke and said "I found out you are the manager and I would like to have my money." Defendant Burke replied "You so and so, if you don't get out of here, I take and throw you out of here." Defendant Burke told Tillie he had just received the Navarro money. The debt, amounting to $183.10, had been paid on August 13, 1947, and the agency did not inform Tillie that it had been collected on that date. Tillie testified in this connection that at the time the defendant Burke threatened to throw him out of the office, defendant Harris was present and Harris offered to help throw Tillie out. On November 10, 1947, the agency sent Tillie a check for $89.88; $84.69 of this amount being for his share of the Navarro collection.

Count 4: In February, 1948, the Emergency Hospital turned over to the agency the account of Mrs. Ruth Allen amounting to $15 and on April 24, 1948, Mrs. Allen paid the bill, but the Emergency Hospital's first knowledge that it had been paid was when a check therefor came in the mail on August 10, 1948.

Another account, that of Romo, which was assigned to the agency in 1947, was paid by Romo in November of that year, but the Emergency Hospital's share of the collection, amounting to $50.89, was not sent to the client until July 12, 1948, and the agency had not informed the client of the collection in the interim.

Count 5: On August 6, 1940, Floyd Dawson, who was in Iowa at the time, executed a promissory note for $186 and upon his default in the payment thereof, his cosigners paid the lender. Dawson came to Riverside in 1941 and in December, 1946, was sued by the agency for $306.70. Dawson paid $295 to the agency on February 4, 1947, and received a receipt

in full, signed by defendant Cossey. On February 5, 1947, Dawson wrote to Leversee, one of the cosigners, informing him of the payment of the money to the agency.

On May 22, 1947, an attorney of Cedar Falls, representing the estate of Lee Clair Martin, wrote to the agency asking for a report on the status of the claim, and on June 12, 1947, the agency wrote the attorney to the effect that the defendants had nothing and that a settlement in full for $100 would be appropriate and asked whether or not such a settlement would be acceptable. On March 1, 1948, an attorney, who had taken over the previous attorney's practice in Iowa, requested information relative to the Dawson collection and was informed on March 11, by letter, that the agency was unable to persuade the defendant to do anything more about the claim; "that the present status of their assets is, if anything, considerably worse than it was at that time. At that time they had an old 1930 Ford car, which they no longer have. However, may we suggest that you contact your clients, Mr. Leversee and Mr. Isley, and determine whether or not a settlement of $100.00 would be acceptable to them."

The attorney then informed the agency that he had a letter from Mr. Dawson in which Dawson stated that he had paid the company the sum of $295 on the claim about a year previously. After some further correspondence, the agency, on March 25, 1948, sent a check for $124, signed by R. Douglas Cossey, in payment of the account.

Count 6: The testimony as to this count concerns the assignment to the agency for collection of several accounts by Dr. Sargent. These accounts were assigned in October, 1945, and in at least one instance, the doctor did not receive his share of the moneys collected until August, 1948, and had not received his share of three accounts up to the day he testified in the trial.

Count 7: Witness Harry Starr testified that Clarence Miller owed him $230 in 1945; that he assigned the claim to the agency for collection and that at no time thereafter had he collected any money "direct from Miller." One check was sent to Starr for $2.50 on June 8, 1947, and another in the sum of $36.50 on September 10, 1947. The ledger sheet on the Harry Starr account showed that Clarence Miller had paid the agency the sum of $78 on December 12, 1946. Defendant Cossey admitted that he had no evidence that Miller had paid Starr "direct" and he did not know why he had paid Starr the sum of $36.50 and could not give any definite reason why a check for $2.50 was sent to Starr on June 8th.

Count 8: Witness William Frolich testified that he assigned to the agency accounts against Cox, Chesebro and Weiss. The Cox account was paid to the agency on March 6, 1948, and the witness' share was paid to him by agency check on August 10, 1948. The Weiss account was paid by the debtor on April 23, 1948, by check. Frolich had not received any money on this account at the time he testified before the grand jury but he later received for his share of the Weiss collection a check from the agency dated September 1, 1948.

Count 9: Arthur Bartz, on July 10, 1947, assigned a claim to the agency for collection for $76.65 against a judgment debtor named Reuben Fox. Fox paid the agency in installments as follows: July 29, 1947, $15; October 16, 1947, $6.20; November 18, 1947, $25; December 16, 1947, $25; January 10, 1948, $26.18. At the time the grand jury met on August 25, 1948, the agency had not paid the creditor, Bartz, any money nor had the agency or any member thereof informed Bartz that Fox had paid the debt in full on January 10, 1948. On September 1, 1948, one week after the indictment, the agency sent Bartz a check for $40.83.

As to this account, defendant Cossey admitted that Bartz was entitled to his fee within 60 days after each installment collection.

Count 10: In March of 1947, Gladys Weidel, who, with her husband, operated the Weidel Dairy, assigned to the agency for collection a number of accounts and again in the following July assigned another group of 40 or 50 accounts. She testified that beginning with June 8, 1947, and ending August 10, 1948, she received checks for some of the collections made by the agency. She stated that the dairy had not collected money "direct" from any debtor after the accounts had been assigned and that on September 1, 1948, she received a request from the agency to supply it with the names and amounts of money the dairy had collected "direct." Mrs. Weidel replied that no money had been collected "direct" and that payments on five accounts assigned to the agency were long overdue and the sum of $50.48 was due the dairy as its share of the collections.

On October 13, 1948, the agency sent a check to the dairy in the sum of $48.36, purporting to be the Weidels' share of "all the collections." In this connection, defendant Cossey admitted that according to his ledger, McManners (one of the debtors) paid the agency on July 9, 1947, but that the agency

did not pay the dairy its share until August 10, 1948, and that Parks, another debtor, had paid the agency on August 1, 1947, but that remittance was not made to the client until August 10, 1948. He further testified that from March 17 to August 5, 1947, the agency had collected on a number of accounts and the share due the dairy was $108.04 but that the agency had only sent the client $29.72.

Testimony was adduced concerning three other transactions of a similar nature to those set out and described in the foregoing counts, but not charged therein as overt acts.

█ The prosecution in the case before us is based upon a violation of section 182 of the Penal Code, which defines the offense known as criminal conspiracy and prescribes the punishment therefor. The offense, as therein designated, may be to do a number of things which are specifically set forth in subdivisions 1, 2, 3, 4 and 5 of the section, and, apparently, in the instant case the prosecution was under subdivision 1, which is a conspiracy (to commit any crime). The gist of the charge is conspiracy and all of the objects of such a conspiracy may be the subject of one charge. As was said in *People* v. *Gilbert*, 26 Cal.App.2d 1, 7 [78 P.2d 770]:

"The trend of judicial decisions in this state is to the effect that to do all of the things enumerated in the different subdivisions of section 182 of the Penal Code amounts to a single offense only. (*People* v. *Johnson*, 22 Cal.App. [362] 364 [134 P. 339].) The language of that section is inclusive and elastic enough to permit the framing of an indictment charging conspiracy to do or commit any or all of the illegal acts referred to therein. (*People* v. *MacPhee*, 26 Cal.App. 218, 220 [146 P. 522].)"

The conspiracy, that is to say, the unlawful agreement or combination, is one offense, no matter how diverse its objects. (*People* v. *Yant*, 26 Cal.App.2d 725, 731 [80 P.2d 506].)

In 15 C.J.S., section 47, page 1073, it is stated that the gist of the offense of conspiracy is the conspiracy, "which is single, although the object is to commit several crimes."

In *Braverman* v. *United States*, 317 U.S. 49 [63 S.Ct. 99, 87 L.Ed. 23] one of the questions for decision was whether a conviction upon the several counts of an indictment, each charging conspiracy to violate a different provision of the internal revenue laws, where the jury's verdict was supported by evidence of but a single conspiracy, would sustain a sentence of more than two years' imprisonment, the maximum

penalty for a single violation of the conspiracy statute. It was there held:

"When a single agreement to commit one or more substantive crimes is evidenced by an overt act, as the statute requires, the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one."

The question before us is not whether several conspiracies are in fact charged in the indictment but rather whether the evidence submitted to the jury proved more than one conspiracy. A careful perusal of the record in this case contained in a reporter's transcript of over 2,600 pages, impels us to conclude that there is sufficient, substantial evidence in the record to show a conspiracy on the part of defendants Cossey and Burke to operate the Southern California Collection Company in such a manner as to violate the provisions of section 182 of the Penal Code. The record shows the commission of various acts by these two defendants which undoubtedly were misappropriations of the moneys collected by them for their clients. If we assume, as indeed we must, that the defendants could be charged with a separate, unlawful agreement or conspiracy with respect to each act upon which they made collections, it is still essential that the prosecution prove such separate and distinct agreements with respect to each account so collected. As noted, all of the counts contained identical language as to the section of the code alleged to have been violated and as to the time within which the offenses were alleged to have been committed. The evidence shows that each account mentioned was handled by the defendants in a different manner. In some instances the payments of moneys received were made in installments for reasons which are unexplained; in others, the amounts due from the agency to its clients were not paid until after the grand jury indictment, and in still others, the amounts due from the agency to its clients were never paid. In one instance, referring particularly to count five, the evidence shows a deliberate intent to withhold and appropriate moneys theretofore collected by the defendants. The general course of conduct pursued by

the defendants was to offer various excuses of their failure to promptly remit to their clients the moneys due them.

The bank statements reflect a misappropriation by the agency of moneys received which were required by law to be kept in a trust account for payment to clients of the agency. These and many other circumstances shown by the record indicate clearly that there was an agreement by the two defendants Cossey and Burke to operate the agency in violation of sections 182 and 484 of the Penal Code. The evidence as to count five is amply sufficient to support a conviction of a conspiracy to violate these code sections, and while the evidence as to some of the other counts may not be sufficient to establish separate conspiracies, at least one conspiracy, with several different objects, was proved.

Defendant Harris was convicted of the offense charged in the third count of the indictment, but we cannot find substantial, credible evidence in the record to show that he was a party to a conspiracy with reference to the act described in the charge.

■ It is contended that the superior court had no jurisdiction over the offenses charged in the indictment because the conspiracies charged were conspiracies to commit a misdemeanor. This argument is without merit as the punishment prescribed for the commission of any of the acts described in section 182 of the Penal Code other than felonies are punishable by imprisonment in the county jail or in the state prison. The superior court possesses jurisdiction to try the defendants for conspiracy to commit the crime of petty theft. (*People v. Van*, 30 Cal.App.2d 663, 665, 666 [87 P.2d 57].) Furthermore, section 182 of the Penal Code, as amended in 1943, specifically provides that all cases of conspiracy may be prosecuted and tried in the superior court of any county in which any overt act tending to effect such conspiracy shall be done.

■ It is next urged that the court erred in permitting the prosecuting attorney to exhibit to the jury large, legible charts upon which were written out the transactions contained in the ten counts of the indictment. These charts were used by the prosecuting attorney in the cross-examination of the defendant Cossey. They were not evidence in the case and were used much as diagrams made on a blackboard are frequently used to illustrate the testimony of witnesses. We see no error in this procedure. (*Haase* v. *Central Union High Sch. Dist.*, 27 Cal.App.2d 319, 322, 325 [80 P.2d 1044].)

■ It is next urged that the court erred in admitting tes-

timony concerning similar offenses. This contention is likewise without merit, as the transactions referred to in the testimony in that connection were similar to the other counts and admissible to show intent, scheme, plan or system. (*People* v. *Henderson*, 79 Cal.App.2d 94, 119 [179 P.2d 406].)

 Defendants argue that error was committed in denying their motion to require an election of counts and in this connection cite section 954 of the Penal Code. That section, however, is not applicable where two or more offenses are charged in the indictment or information as authorized by this section or where a series of acts form part of the one and the same transaction. (8 Cal.Jur. 229, 230, § 300.)

 The defendants complain that the district attorney committed prejudicial misconduct in that the prosecuting attorney referred to a bank account which defendant Cossey at one time had and that the signature card bore the name of his second wife. Also, that after the divorce, her name was removed from the card. The defense attorney did not cite the statement as misconduct, nor did he call for an admonition to the jury. Hence, the matter should not be considered on appeal. (*People* v. *Dye*, 81 Cal.App.2d 952, 960 [185 P.2d 624].) At most, it was an irrelevancy and in nowise prejudicial. (Cal. Const., art. VI, § 4½.)

The prosecuting attorney referred to interviews with defendant Burke prior to the indictment and compared his compensation with that of Burke. The prosecutor also commented on Cossey's financial position. No assignment of misconduct was made nor request for admonition to the jury and no prejudicial error resulted.

 Complaint is also made of error in the giving of instructions. The first instruction complained of was to the effect that the jury might consider evidence of similar offenses. Under the pleadings in the case, the instruction was proper as all counts were for conspiracy to commit theft and the evidence offered was of transactions similar in nature to those alleged in the indictment.

Defendants find fault with the court's instruction respecting the law of embezzlement, in effect quoting section 511 of the Penal Code. The complaint is that the instruction was not applicable because the defendants were not charged with embezzlement of the property of the debtor. Penal Code, section 484, has consolidated the various types of theft, including embezzlement, under one cognomen.

114

■ The record indicates that the prosecution should have drawn the indictment herein so as to charge one conspiracy to commit all of the acts charged in the various counts of the indictment. (C.J.S., § 47, p. 1074; *People* v. *Gilbert*, 26 Cal. App.2d 1 [78 P.2d 770].) However, this court is authorized to reverse, affirm or modify the orders appealed from and may reduce the degree of the offense or the punishment imposed. (Pen. Code, § 1260.)

As was said in *People* v. *Nasworthy*, 94 Cal.App.2d 85, at page 90 [210 P.2d 83]:

"The evidence is ample to sustain defendants' conviction of a conspiracy to commit a crime, and the only remedy to which defendants are entitled as far as the conspiracy is concerned is that they should be dealt with as having been convicted of but one conspiracy, instead of two."

In *People* v. *Scott*, 24 Cal.2d 774, 783 [151 P.2d 517], where a defendant had been convicted of three counts of rape, it was determined on appeal that all of his acts constituted but one offense and the judgment was modified to provide for punishment of but one offense.

In the instant case, we deem it appropriate under the authority of Penal Code, section 1260, to modify the judgment herein to adjudge the defendant Cossey to have been found guilty of the crime of conspiracy and to be punished by imprisonment in the state's prison as prescribed by law. (*People* v. *Kynette*, 15 Cal.2d 731, 762 [104 P.2d 794].)

■ A notice of motion to dismiss the appeal herein as to defendant Cossey has been filed by the attorney general. The motion is based on affidavits in which it is stated that Cossey is now in Canada; that he refuses to return to this state and is a fugitive from justice. The argument is that this court has power to dismiss an appeal where the defendant is not subject to the jurisdiction of the court. It is no doubt true that where a defendant escapes from custody and is a fugitive, a dismissal is proper. (*People* v. *Redinger*, 55 Cal. 290 [36 Am.Rep. 32]; *People* v. *Clark*, 198 Cal. 453 [245 P. 1112]; *People* v. *Fuhr*, 198 Cal. 593 [246 P. 1116]; *People* v. *Clark*, 201 Cal. 474, [259 P. 47].) But the custody may be actual or constructive. (*People* v. *Redinger, supra*.) In the instant case the defendant was released on $25,000 bail pending the decision herein on appeal. He need not appear personally in this court. (Pen.Code, ·§ 1255.) There is no showing that proceedings have been commenced to increase the amount of bail, declare its forfeiture or attack the sufficiency thereof. In the absence

of such a showing, the defendant Cossey is in constructive custody in the instant case.

The motion to dismiss as to defendant Cossey is denied. The judgment is modified to read "Whereas, the said Ralph Douglas Cossey, also known as Douglas R. Cossey, has been found guilty of the crime of conspiracy to commit theft, a violation of sections 182 and 484 of the Penal Code of the State of California. It is therefore ordered, adjudged and decreed that the said Ralph Douglas Cossey, also known as Douglas R. Cossey, be punished by imprisonment in the state prison of the State of California at San Quentin for the term prescribed by law." As so modified, the judgment and order denying a new trial as to defendant Ralph Douglas Cossey, also known as Douglas R. Cossey, are affirmed.

No judgment has been entered as against defendant Gerald F. Burke, as he was granted probation. Since we have held that the evidence supports his conviction of but one offense of conspiracy, the order denying his motion for a new trial is affirmed.

The order denying the motion for a new trial as to defendant John H. Harris is reversed.

Barnard, P. J., and Griffin, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied May 18, 1950. Carter, J., voted for a hearing.